**UNITED STATES of America, Appellee,**

v.

**Oscar ROSA, Vincent Lopez, Ricardo Rodriguez, Hector Hernandez, and Armando Velasquez, Defendants–Appellants.**

Nos. 954, 961, 992, 996, 1061, Docket 91–1729 to 91–1731, 92–1064 and 92–1504.

United States Court of Appeals, Second Circuit.

Argued April 19, 1993.

Decided Dec. 3, 1993.

Edward A. Rial, Asst. U.S. Atty., Brooklyn, NY (Mary Jo White, U.S. Atty., E.D.N.Y., Peter A. Norling, Emily Berger, Susan Corkery, Asst. U.S. Attys., on the brief), for appellee.

Casey Donovan, New York City, for defendant-appellant Oscar Rosa.

David Gordon, New York City, for defendant-appellant Vincent Lopez.

Robert S. Wolf, New York City, for defendant-appellant Ricardo Rodriguez.

Hal Meyerson, New York City (Meyerson & Ramos, New York City, on the brief), for defendant-appellant Hector Hernandez.

Philip R. Katowitz, New York City, for defendant-appellant Armando Velasquez.

Before: KEARSE and ALTIMARI, Circuit Judges, and SWEET, District Judge *.

KEARSE, Circuit Judge:

Defendants Oscar Rosa, Vincent Lopez, Ricardo Rodriguez, Hector Hernandez, and Armando Velasquez appeal from judgments entered in the United States District Court for the Eastern District of New York following a jury trial before Thomas C. Platt, *Chief Judge*, convicting them of various narcotics, racketeering, and weapons offenses. Each of these defendants was convicted of conspiring to distribute and to possess with intent to distribute more than one kilogram of heroin and more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (1988). In addition, Rosa was convicted of conspiring to travel interstate for the purpose of purchasing firearms in aid of unlawful activity, in violation of 18 U.S.C. §§ 371

* Honorable Robert W. Sweet, of the United States District Court for the Southern District of New York, sitting by designation.

and 1952(a)(3) (1988); receiving a firearm without a license, in violation of 18 U.S.C. §§ 922(a)(3), 924(a)(1)(D), and 2 (1988); attempting to possess with intent to distribute more than 100 grams of heroin, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B) (1988); possessing an unregistered firearm, in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d), and 5871 (1988); and possessing a defaced firearm, in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(i), and 5871 (1988). Lopez was convicted of committing violent crimes, to wit, kidnaping, assault with a dangerous weapon, and assault resulting in serious bodily injury, for the purpose of maintaining or increasing his position in a racketeering enterprise, in violation of 18 U.S.C. §§ 1952B(a)(1) and 1952B(a)(3) (Supp. II 1984) (18 U.S.C. § 1952B *renumbered* 18 U.S.C. § 1959 (1988) (collectively "§ 1959") by Pub.L. 100–690, § 7053(b), 102 Stat. 4181, 4402 (1988)), and 18 U.S.C. § 2. Rodriguez and Velasquez were convicted of possessing with intent to distribute more than one kilogram of heroin, in violation of 21 U.S.C. § 841(a)(1) (1988), 21 U.S.C. § 841(b)(1)(A), and 18 U.S.C. § 2. Hernandez was convicted of committing violent crimes, including murder, conspiracy to kidnap, and conspiracy to assault with a dangerous weapon, for the purpose of maintaining or increasing his position in a racketeering enterprise, in violation of 18 U.S.C. §§ 1959 and 2; and using a firearm during and in relation to drug trafficking, in violation of 18 U.S.C. §§ 924(c)(1) and 2 (1988).

Rosa was sentenced principally to life imprisonment and was ordered to pay a $1,000,000 fine. The remaining defendants were sentenced principally to the following terms of imprisonment, each to be followed by five years' supervised release: Lopez 405 months, Rodriguez 170 months, Hernandez 405 months, and Velasquez 262 months.

On appeal, defendants make numerous challenges to their convictions, including challenges to evidentiary and procedural rulings, the sufficiency of the evidence, the district judge's conduct, and the prosecutor's rebuttal summation. They also challenge various aspects of sentencing. For the reasons below, we reverse Rosa's conviction for attempted possession of heroin on the ground that the evidence was insufficient; we vacate his sentence and remand for recalculation in light of that reversal and for explanation of the sentence chosen, as required by 18 U.S.C. § 3553(c) (1988); and we vacate the sentences imposed on Rodriguez and Hernandez and remand for findings as to their roles in the offenses. In all other respects, we affirm.

## I. BACKGROUND

The present appeals arise out of the prosecution of Rosa, Lopez, Rodriguez, Hernandez, Velasquez, and some 34 other individuals, including the defendants whose appeals were decided in *United States v. Concepcion,* 983 F.2d 369 (2d Cir.1992) ("*Concepcion* "), *cert. denied,* —— U.S. ——, 114 S.Ct. 163, 126 L.Ed.2d 124 (U.S. Oct. 4, 1993), and Geraldo Vega, whose appeal was heard in tandem with the present appeals and has been decided separately, *see United States v. Vega,* 11 F.3d 309 (2d Cir.1993), in connection with their operation primarily in the Bushwick, Williamsburg, and East New York sections of Brooklyn, New York, of a wholesale and retail narcotics organization known as the "Unknown Organization" ("Organization"). The evidence presented at the trial of Rosa, Lopez, Rodriguez, Hernandez, and Velasquez included the testimony of 57 witnesses, including 13 accomplices. One of the latter was Ricardo Melendez, who was the founder of the Organization and, until his arrest in September 1988, its leader. Convicted of, *inter alia,* racketeering and narcotics conspiracy at the trial described in *Concepcion,* Melendez thereafter began to cooperate and testified for the government in the trial of the present appellants. Taken in the light most favorable to the government, the evidence revealed the following.

The Organization consisted of a highly structured distribution network that purchased relatively pure narcotics, diluted them, packaged them in glassine envelopes at locations known as "mills," and sold them through 24–hour street sales locations known as "spots." At its peak, the Organization received gross income from heroin sales of more than $8 million a month.

Rosa, a charter member of the Organization who had known Melendez for many years, was a lieutenant who controlled spots in Bushwick, where he sold an average of $200,000 worth of heroin a week. Rosa was also, with Vega and Hernandez, responsible for making wholesale purchases of heroin. Lopez was a "runner" for the organization in 1987, responsible for distributing narcotics to various spots, and over the years played several roles, including that of enforcer. Sometime after the March 1989 arrest of Manuel Concepcion, who had succeeded Melendez as leader after the latter's 1988 arrest, Lopez, along with Hernandez and two other codefendants, became leaders of the Organization. Hernandez, in addition to being responsible for wholesale purchases of heroin, supervised a heroin bagging operation in his home and was an enforcer. Velasquez and Rodriguez were involved in bagging heroin. Velasquez eventually became a manager of one bagging mill when it was moved into a building in which he was the resident superintendent.

The Organization employed hundreds of people and maintained employee loyalty and discipline principally by means of violence and intimidation. For example, Todd Middleton, who worked for the Organization as, *inter alia*, a runner, testified that in early 1987 he was accused of stealing Organization money. His supervisor, with the assistance of other members, cut off part of one of Middleton's fingers. Later that year, Middleton was loitering near a spot where he did not belong and was accused of stealing from Organization customers. Lopez and other Organization members kidnaped Middleton, beat him senseless, and stabbed him with an ice pick 80–100 times. Similarly, in July 1986, defendant Hector Hernandez ("Hernandez"), who was then performing a variety of functions for the Organization, arranged the kidnaping and beating of one Pedro Hernandez ("Pedro"), an Organization runner suspected of robbing another worker. Hernandez had Organization members forcibly take Pedro to an apartment where they beat and stabbed him and pulled out one of his teeth with pliers. In the summer of 1989, Hernandez got into an argument with one Walter Hambrick about an Organization spot run by Hernandez. Hernandez shot the unarmed Hambrick four or five times, killing him.

Following an investigation by a United States Drug Enforcement Administration ("DEA") task force, Rodriguez and Velasquez were arrested in May 1989 in connection with a raid by agents on an Organization mill located on the fifth floor of a building at 244–46 Roebling Street in Brooklyn, of which Velasquez was the superintendent. The arrests were made after Rodriguez and other workers, as the agents were attempting to enter, fled down the fire escape and into Velasquez's apartment one floor below. From the mill, the agents recovered, *inter alia*, thousands of glassine bags stamped "Unknown" and containing a total of more than one kilogram of heroin, heroin cutting materials, and time records. In Velasquez's apartment, following the acquisition of a search warrant, agents found thousands of empty glassine envelopes stamped with "Unknown" and other Organization "brand names." Rosa, Lopez, Hernandez, and numerous other Organization members were arrested at various times in 1989.

In September 1989, indictments were handed down against some 39 individuals, including the present appellants, charging them with, *inter alia*, narcotics offenses, weapons offenses, and murder and kidnaping in furtherance of racketeering activity. Rosa, Lopez, Rodriguez, Hernandez, and Velasquez, along with three codefendants, had their cases severed from those of Melendez, Concepcion, Vega, and others, and were tried in a two-month trial. Each was convicted on all counts in which they were charged and were sentenced as indicated above.

## II. DISCUSSION

On appeal, defendants make a variety of arguments, principally challenging the trial court's evidentiary and procedural rulings, the sufficiency of the evidence, and the calculation of their sentences under the federal Sentencing Guidelines ("Guidelines"). We find merit only in certain of the sentencing arguments and in Rosa's contention that the

evidence was insufficient to support his conviction for attempted possession of heroin.

## A. *Challenges to the Admission of Evidence*

Defendants make numerous challenges to the admission of evidence at trial, including Fourth and Fifth Amendment challenges to evidence turned up in searches of their homes, a due process challenge to the introduction of certain identification testimony, a Sixth Amendment challenge to the introduction of an admission made to an informant, and challenges under the Federal Rules of Evidence. We reject each of their contentions.

### 1. *Velasquez's Suppression Motion*

Following the raid on the Roebling Street mill, the government applied to a magistrate judge for a search warrant for Velasquez's apartment. The supporting affidavit by one of the agents who had participated in that raid stated, *inter alia,* that weapons and 20,000 glassine envelopes apparently filled with heroin had been found in the fifth floor drug mill; that when several agents attempted to enter, other agents waiting outside the building saw plates containing a white powder believed to be heroin being thrown out the window; that individuals from the mill had fled down a fire escape in a rainstorm and gone into Velasquez's apartment; and that agents found four individuals there, wet and covered with white powder, feigning sleep. An Assistant United States Attorney ("AUSA") also told the magistrate judge, inaccurately, that agents had previously received information about narcotics trafficking in the apartment as well as at the mill. Velasquez, in reliance on this misstatement and on the fact that the affidavit did not disclose that a security sweep of his apartment had turned up no weapons or contraband, unsuccessfully challenged the validity of the search warrant issued for his apartment on the ground that it was obtained on the basis of false information. He also contended that the warrant was issued on less than probable cause. He pursues these contentions on appeal. We find in them no merit.

With respect to a challenge to the probable-cause determination, the duty of a court reviewing the validity of a search warrant is "simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–39, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and "doubts should be resolved in favor of upholding the warrant." *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983). We think it plain that the indisputable information provided by the search warrant affidavit, describing (a) the substantial heroin processing operation in the mill, and (b) the processing individuals' use of the Velasquez apartment one floor below as a haven from government pursuit, provided an ample basis for the magistrate judge to issue a search warrant for Velasquez's apartment.

In order to prevail on a contention that a search warrant was issued on the basis of false information, a defendant must show that the false statements were made knowingly and intentionally, or with a reckless disregard for the truth, and that they were necessary to the finding of probable cause. *See, e.g., Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978); *United States v. Orozco–Prada,* 732 F.2d 1076, 1089 (2d Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984); *United States v. Barnes,* 604 F.2d 121, 151–53 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Velasquez has not made these showings.

The suggestion that agents had had information as to illegal activity in Velasquez's apartment before the millworkers fled there was not made in the agent's affidavit, and Velasquez presented no evidence that the AUSA's misstatement was intentional or reckless. Further, it is plain that even without any suggestion of prior knowledge of a drug connection with Velasquez's apartment the affidavit provided ample probable cause for the issuance of a search warrant. Hence,

the AUSA's misstatement was not necessary to the finding of probable cause.

▉ Nor was the search warrant affidavit's failure to state that a security sweep of Velasquez's apartment had turned up no weapons or contraband a material omission. The affidavit stated that agents had "secure[d]" the apartment. That process normally involves a protective sweep, and had such items been found, the affidavit would likely have so stated. Thus, we think it likely that the magistrate judge inferred from the affidavit's disclosure of a sweep, together with its silence as to discovery of incriminating items, that the security sweep turned up no such items. Certainly the magistrate would not have inferred from such silence that incriminating items had been found. In any event, the existence of probable cause was not diminished by the fact that contraband and weapons were not sufficiently exposed to view to be discovered in a security sweep.

### 2. *Rosa's Suppression Motion*

Prior to trial, Rosa moved to suppress certain evidence against him, including post-arrest statements and various weapons, as the product of *Miranda* violations (*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Judge Arthur D. Spatt, to whom the case was then assigned, referred the motion to Magistrate Judge John L. Caden, who conducted an evidentiary hearing at which several law enforcement officers, including New York City Police Detective Stephen Peitler, testified. Peitler testified that the agents had sought to execute an arrest warrant for Rosa at about 1:30 A.M. on August 22, 1989. In the interest of safety, the agents decided to lure Rosa out of his home for the arrest. They did so by telling him, falsely, they had just caught a man breaking into Rosa's car. Having induced Rosa to get dressed and come out, the agents then arrested him. On cross-examination, Peitler acknowledged that he had lied to Rosa about his car being stolen in order to get Rosa out of his house, and expressed his willingness to engage in such a lie if necessary "[i]n the course of [his] duties to protect the safety of others and [him]self" and to protect the investigation. (Transcript of Hearing before Magistrate Judge, June 4, 1990, at 30–31.)

Peitler testified that he read *Miranda* warnings to Rosa, and suggested that Rosa cooperate and allow the agents to accompany him into the house. Initially Peitler testified that he read those warnings while outside. After other agents testified that Peitler had placed Rosa in a car, Peitler testified that he had indeed put Rosa in a government car and that he had read him the *Miranda* warnings in the car, suggesting cooperation thereafter. None of the other agents, including an agent who, according to Peitler, was in the government vehicle with Rosa, could remember whether Rosa was given *Miranda* warnings. According to Peitler, Rosa stated that he did not need an attorney and agreed to go inside his house with several agents. Thereafter, Rosa admitted he had an Uzi submachine gun, which the agents recovered. And although initially refusing Peitler's request for permission to search the house, after a few hours, during which Rosa was taken to DEA headquarters, Rosa gave a written consent for a search of the house. The search turned up, *inter alia*, a .380 caliber semiautomatic pistol and a .22 caliber gun in the form of a pen.

The magistrate judge recommended that Rosa's motion to suppress be granted, finding that Rosa had not been given *Miranda* warnings outside his home, had not consented to the entry of his home, and had not signed the consent-to-search form voluntarily. The magistrate judge discredited Peitler's testimony because, (1) Peitler had changed his testimony as to Rosa's location when Peitler gave him *Miranda* warnings, (2) none of the other agents had heard Peitler give *Miranda* warnings or heard Rosa agree to the entry of his home, and (3) "Detective Peitler's credibility at least in this judge's mind has been severely weakened and destroyed by his admission during cross-examination in this hearing that he would lie to protect the integrity of this investigation." (Transcript of Hearing/Decision July 3, 1990, at 58.)

After the government objected to the magistrate judge's recommendation, Chief Judge

Platt, to whom the case had been reassigned, reviewed the transcript of the evidentiary hearing and elected, over Rosa's objection, to hear live testimony from Peitler in order to make an independent assessment of Peitler's credibility. Peitler's testimony before Chief Judge Platt was generally consistent with his testimony before the magistrate judge; Peitler testified that he put Rosa into a government vehicle before reading *Miranda* warnings. He also testified that the arrest of Rosa occurred in the midst of a massive round-the-clock series of raids, culminating in some 30 arrests in a two-day period. He attributed the inability of his fellow agents to remember the warnings given Rosa to the fact that so many arrests had been made in a concentrated period of time in which the agents had had no sleep. Peitler also testified that although he was willing to tell a lie in the course of an investigation, he would not lie under oath. The court offered the parties the opportunity to call additional witnesses. Both sides declined.

In a ruling from the bench at the close of the hearing and in a Memorandum dated August 26, 1991 ("D.Ct. Decision"), the court rejected the magistrate judge's recommendation and denied Rosa's suppression motion, finding that Peitler had given *Miranda* warnings while Rosa was in the car, and that Rosa waived his rights, consented to enter his home with the agents for the purpose of having a discussion, and thereafter freely and voluntarily gave his consent to the search. The court found Peitler's testimony consistent and credible and his demeanor trustworthy. It discounted the magistrate judge's credibility assessment of Peitler, finding that the magistrate judge had misinterpreted Peitler's testimony that he would lie to protect the integrity of an investigation. The court concluded that Peitler had not intended to testify that he would commit perjury. The court also found it immaterial that the other agents could not "specifically testify to seeing or hearing Detective Peitler read Rosa his *Miranda* rights or to hearing Rosa consent to the entry of his home," D.Ct. Decision at 17, noting that none of the witnesses contradicted Peitler's testimony that such warnings had been given, and finding it likely that the number of arrests made and

the stress under which the officers were operating during the relevant period explained their inability to recall details of this arrest, *id.* at 17–20.

On appeal, Rosa contends that the district court could not properly reject the magistrate judge's recommendation without hearing live testimony from all the witnesses who testified before the magistrate judge. He also argues that the court's conclusions that Rosa voluntarily waived his *Miranda* rights and voluntarily consented to the search of his home were erroneous. We reject his contentions.

■ The Federal Magistrates Act, 28 U.S.C. §§ 631–639 (1988), does not allow a magistrate judge to decide a motion for suppression of evidence in a criminal prosecution. *See* 28 U.S.C. § 636(b)(1)(A); *United States v. Raddatz,* 447 U.S. 667, 673, 100 S.Ct. 2406, 2410, 65 L.Ed.2d 424 (1980). The district judge remains the ultimate decisionmaker. After a magistrate judge has heard such a motion and has submitted proposed findings of fact and recommendations to a district judge, *see id.* § 636(b)(1)(B), the district judge is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made," *id.* § 636(b)(1). In making its decision, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate," and "may also receive further evidence." *Id.*

■ A court that has decided to receive further evidence need not hear live evidence from each of the witnesses who appeared before the magistrate judge. *See Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir.1989); *see also Peretz v. United States,* —— U.S. ——, ——, 111 S.Ct. 2661, 2670, 115 L.Ed.2d 808 (1991) (court may opt to " 'rehear the evidence in whole or in part' ") (quoting *United States v. Raddatz,* 447 U.S. 667, 685, 100 S.Ct. 2406, 2417, 65 L.Ed.2d 424 (1980) (Blackmun, J., concurring)). Although the rejection of a magistrate judge's credibility assessments "without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious ques-

tions," *United States v. Raddatz,* 447 U.S. at 681 n. 7, 100 S.Ct. at 2415 n. 7, a court having doubts as to those credibility findings need hear testimony from only the witnesses whose credibility is in question. *See Grassia v. Scully,* 892 F.2d at 20.

■ The district court in the present case acted entirely within this framework. It properly elected to hear live testimony from Peitler in order to make an independent assessment of Peitler's credibility. It afforded Rosa the opportunity, which was declined, to call other witnesses. The court was not required to call the other witnesses who had testified at the first hearing; their testimony merely failed to support, and did not contradict, Peitler's testimony. Thus, the decision whether or not to credit the testimony of Peitler did not hinge on an assessment of the credibility of his fellow officers.

■ Nor are we persuaded by Rosa's challenges to the merits of the court's rulings. A district court's finding, after an evidentiary hearing, that a defendant had received his *Miranda* warnings prior to making statements must be upheld unless it is clearly erroneous. *See, e.g., United States v. Isom,* 588 F.2d 858, 862 (2d Cir.1978). The same standard applies to a finding that the defendant voluntarily consented to a search. *See, e.g., United States v. Ramirez-Cifuentes,* 682 F.2d 337, 344 (2d Cir.1982); *United States v. Forero-Rincon,* 626 F.2d 218, 224 (2d Cir.1980); *United States v. Vasquez,* 612 F.2d 1338, 1347 (2d Cir.1979), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980). Assessments of the credibility of witnesses are the province of the district court, and we are not entitled to overturn those assessments on appeal. *See, e.g., United States v. Maldonado-Rivera,* 922 F.2d 934, 972 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991).

■ Although we could not have overturned a decision by the district court to reject Peitler's testimony, we cannot second-guess its decision to credit that testimony. There was no testimony that was contradictory, either by Rosa, who did not testify at either hearing, or by Peitler's fellow officers

who said they simply did not remember. Peitler's testimony, once credited, was sufficient to support the findings that Peitler advised Rosa of his *Miranda* rights and that Rosa voluntarily waived those rights and voluntarily consented to the entry and search of his home.

3. *Rosa's Jailhouse Statement to a Cooperating Witness*

The government introduced testimony by cooperating witness Joseph Ukperaj, a participant in the Organization's gun smuggling operation, that, while he and Rosa were being detained at the Manhattan Correctional Center ("MCC"), Rosa stated that he had been arrested with a gun he had bought from Ukperaj. Rosa contends that the admission of this statement violated his Sixth Amendment right to counsel. This contention need not detain us long.

■ Although once the right to counsel has attached, the Sixth Amendment imposes on the government an affirmative obligation not to solicit incriminating statements from the defendant in the absence of his counsel, *see, e.g., Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964); *see also Maine v. Moulton,* 474 U.S. 159, 171, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985), that obligation is not breached unless the government has taken some action "that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 2629, 91 L.Ed.2d 364 (1986). The Sixth Amendment is not violated by the merely fortuitous receipt of incriminating statements:

> [A] defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.*

■ In the present case, Ukperaj testified that after he agreed to become a cooper-

ating witness, the government did not ask him to have conversations with any of the defendants while in custody. He testified that thereafter, at MCC, he ran into Rosa unexpectedly. Ukperaj had not discussed Rosa with the government and was unaware that Rosa had been arrested. He asked Rosa why Rosa was at MCC, and Rosa responded, in part, that Ukperaj had better be careful because Rosa had been arrested with one of the guns Ukperaj sold him.

The district court, crediting Ukperaj's testimony, found that Ukperaj "didn't seek out [Rosa] and try to solicit information from him." (Trial Transcript ("Tr.") 2927.) This finding is not clearly erroneous, and Rosa accordingly did not establish a violation of his Sixth Amendment rights.

### 4. Rodriguez's Challenge to Identification Testimony

Cooperating witness Kenneth Colon had been a high-ranking member of the Organization who was in charge of, *inter alia*, picking up packaged narcotics from the Organization's mills. Sigfredo Pacheco had been a mill supervisor. These two witnesses, along with others, identified Rodriguez as an Organization millworker. Rodriguez complains that he was not given advance notice that identification testimony would be given, and he contends that their in-court identifications of him were tainted because they had been shown a photographic array containing his picture shortly prior to trial. We reject these contentions.

■ A defendant's right to due process includes the right not to be victimized by suggestive police identification procedures, including suggestive displays of photographs, that create "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *see also Manson v. Brathwaite*, 432 U.S. 98, 105 n. 8, 114, 97 S.Ct. 2243, 2249 n. 8, 2253, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972); *Concepcion*, 983 F.2d at 377; *Jarrett v. Headley*, 802 F.2d 34, 40–41 (2d Cir.1986). The fairness of a photographic array depends on a number of factors, including the size of

the array, the manner of presentation by the officers, and the array's contents. *Concepcion*, 983 F.2d at 377. If there is nothing inherently prejudicial about the presentation, such as use of a very small number of photographs, *see, e.g., United States v. Bennett*, 409 F.2d 888, 898 (2d Cir.) (array of six not so small as to be impermissibly suggestive), *cert. denied*, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969), or the use of suggestive comments, the "principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit,'" *Jarrett v. Headley*, 802 F.2d at 41 (quoting *United States v. Archibald*, 734 F.2d 938, 940, *modified on other grounds*, 756 F.2d 223 (2d Cir.1984)).

■ In this case, one month prior to trial, Colon was shown a photo spread of six Organization members and was asked if he could name them. At a *Wade* hearing (*United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)), held after Colon had begun to testify at trial, a government agent testified that Colon had proceeded to identify five of the six by their names or nicknames, including Rodriguez, who was known as "Richie." Colon testified slightly differently, stating that though he had not identified Rodriguez by name, he had identified Rodriguez as one of the workers he had seen at Organization mills. Pacheco, just prior to trial, was shown the same six-picture photo spread. At a second mid-trial *Wade* hearing, just prior to his testimony, the evidence was that Pacheco had been asked whether he could pick out "Hector" and "Richie"; he had identified Hernandez as "Hector" and Rodriguez as "Richie."

The district court correctly ruled that these procedures were not unduly suggestive. The photographic array was not impermissibly small, and Rodriguez has not contended that his picture bore any identifying marks. The government agent did not suggest any names to Colon and did not suggest to Pacheco which photos were those of "Hector" or "Richie." We conclude that the in-

court identifications of Rodriguez were not tainted.

■ Finally, whatever the disadvantage to defendants in this case from not having advance notice that certain witnesses would identify them at trial, we cannot conclude that there was any undue prejudice. Defendants had been given notice that Colon and Pacheco would be witnesses at trial. After it became clear that these two witnesses would identify some or all of the defendants, the *Wade* hearings were held in order to determine whether there had been suggestive pretrial identification procedures. The *Wade* hearings sufficed in the circumstances; if notice was required, the lack of notice here provides no ground for reversal.

### 5. *Admission of the Autopsy Report*

With respect to the murder of Hambrick, described in Part I above, the government offered in evidence a New York City Medical Examiner's Office ("Medical Examiner's Office") report on Hambrick's autopsy. The government represented that the author of the report was not available to testify at trial because he had "retired and moved" and the government had "had a difficult time finding" him. (Tr. 3874). The government argued that the report was admissible both under Fed.R.Evid. 803(6) as a business record kept in the regular course of business and under Fed.R.Evid. 803(8) as a public record. Over the objection of Hernandez, who was charged with having murdered Hambrick in order to maintain or increase his position in the Organization, the trial court allowed the government to introduce those portions of the report which contained factual observations and permitted another pathologist from the Medical Examiner's Office to testify about those observations. The court excluded so much of the report as contained the author's diagnosis and his opinions as to the manner and cause of death. On appeal, Hernandez contends that the admission of the report (a) was foreclosed by the Federal Rules of Evidence, as interpreted by this Court in *United States v. Oates,* 560 F.2d 45 (2d Cir.1977) ("*Oates*"), and (b) violated his rights under the Sixth Amendment's Confrontation Clause. For the reasons below, we reject both contentions.

Rule 803(8) provides that certain types of public records are not excludable under the hearsay rule in certain types of cases:

(8) Public records and reports.—Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel,* or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(8) (emphasis added). Rule 803(6) excepts from the hearsay rule records kept in the course of a regularly conducted business activity, defining "business" as including "business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit." Fed.R.Evid. 803(6).

In *Oates,* focusing on the provision in Rule 806(8)(B) for exclusion of observations by police officers "and other law enforcement personnel" and on the provision in Rule 806(8)(C) for the admissibility in criminal cases of governmental investigative factual findings only "against" the government, we ruled that the report and worksheet of a United States Customs Service ("Customs") chemist, whose analysis had revealed that a substance seized from the defendant's companion was heroin, were inadmissible. Adopting the view that the term "other law enforcement personnel" in Rule 803(8)(B) should be "read broadly enough to make its prohibitions against the use of government-generated reports in criminal cases coterminous with the analogous prohibitions contained in FRE 803(8)(C)," *Oates,* 560 F.2d at 67–68, we construed that term "to include, at the least, any officer or employee of a governmental agency which has law enforcement

responsibilities," *id.* at 68. We viewed Customs chemists as "law enforcement personnel" for purposes of Rule 803(8)(B), because Customs had law enforcement authority and its chemists were "important participants in the prosecutorial effort" with responsibility for, *inter alia,* analyzing narcotics, preserving the chain of custody, and testifying at trial. *See id.* We concluded that the chemist's report and worksheet constituted "factual findings resulting from an investigation made pursuant to authority granted by law" within the meaning of Rule 803(8)(C), and hence were not admissible under Rule 803(8).

We went on to rule that the same prohibitions should be read into Rule 803(6), *see* 560 F.2d at 77, and we suggested that these prohibitions might preclude admission under other hearsay exceptions as well, *see id.* at 78, 84; *but cf. United States v. Yakobov,* 712 F.2d 20, 26–27 (2d Cir.1983) (admission of a certificate meeting the requirements of Rule 803(10) (absence of public record) not precluded by Rule 803(8)).

 Notwithstanding the breadth of certain dicta in *Oates,* we are not persuaded that the term "law enforcement personnel" as used in Rule 803(8)(B) should be read to encompass employees of the Medical Examiner's Office. Unlike Customs, which has responsibility for enforcement of, *inter alia,* customs and narcotics laws, *see* 19 C.F.R. §§ 161.0, 161.2 (1993), the Medical Examiner's Office is required simply to investigate unnatural deaths; it refers a death bearing any indicium of criminality to the appropriate district attorney and has no responsibility for enforcing any laws, *see* N.Y. City Charter Ch. 22 § 557 ("Charter"). The chief medical examiner and his assistants are required to be physicians and pathologists; there is no requirement in the Charter that they be attorneys or that any employees of the office have any law enforcement training. Even when a matter is referred to the district attorney because of an indication of criminality, the Charter does not give the medical examiner any responsibility for collecting evidence or determining the identity of the perpetrator. Further, though law enforcement activities are typically accusatory and adversarial in nature, a medical examiner's

reported observations as to a body's condition are normally made as part of an independent effort to determine a cause of death. Indeed, " 'a medical examiner, although often called a forensic expert, bears more similarity to a treating physician than he does to one who is merely rendering an opinion for use in the trial of a case.' " *Manocchio v. Moran,* 919 F.2d 770, 777 (1st Cir.1990) (quoting *State v. Manocchio,* 497 A.2d 1, 7 (R.I.1985)), *cert. denied,* —— U.S. ——, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991). Thus, there are persuasive reasons, vis-à-vis a defendant to a criminal prosecution, for treating the report of a medical examiner differently from the report of a police officer.

The legislative history of Rule 803(8) lends support to the view that Congress did not mean the term "police officers and other law enforcement personnel," whose reported observations were not to be admissible by way of Rule 803(8) against defendants in criminal prosecutions, to include other types of public servants such as medical examiners. As Rule 803(8) was originally proposed to Congress by the Supreme Court, though clause (C) was in its present form, the proposed clause (B) provided for the admission of public records of "matters observed pursuant to duty imposed by law" without carving out matters observed by law enforcement personnel. *See* 56 F.R.D. 183, 301 (1972). Clause (B) was amended in the House of Representatives to include, *inter alia,* the phrase "excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel." *See* 120 Cong. Rec. 2387–89 (1974). The Representative who offered the amendment argued that "in a criminal case, only, we [*sic* ] should not be able to put in the *police report* to prove your case without calling the *policeman,* " *id.* at 2387 (emphasis added), and urged that "in a criminal case the defendant should be confronted with the *accuser* to give him the chance to cross examine." *Id.* at 2388 (emphasis added). The Senate report commented that the reason for the House amendment was that "observations by police officers at the scene of the crime or the apprehension of the defendant are not as reliable as observations by public officials in other cases *because of the adversarial nature*

*of the confrontation* between the police and the defendant in criminal cases." S.Rep. No. 1277, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7064 (emphasis added). Thus, the inclusion of the pertinent limitation in clause (B) was the result of Congressional discussion that focused exclusively on "police officers," and "accuser[s]," and "adversari[es]," and there was no suggestion that the amendment to clause (B) was meant to limit the admissibility of public reports in criminal cases to the same extent as 803(8)(C). *See* 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(8)[01], at 803–238 to 803–239 (1993).

We conclude that the assumption in *Oates* that the restrictions of Rules 803(8)(B) and 803(8)(C) were "coterminous," an assumption made in the context of reports prepared by public officials with responsibilities for enforcing laws, should not be applied in the context of reports of public officials having different responsibilities. Accordingly, we hold that medical examiners' reported observations are admissible under Rule 803(8)(B).

The district court dealt properly with the Hambrick autopsy report within this framework. It allowed in evidence the report's observations, and it excluded the factual conclusions drawn from those observations as required by Rule 803(8)(C).

■ We also reject Hernandez's contention that the admission of the observations in the autopsy report violated his confrontation rights. The Confrontation Clause does not require the exclusion of hearsay evidence that has sufficient "indicia of reliability." *White v. Illinois*, — U.S. —, — n. 8, 112 S.Ct. 736, 742 n. 8, 116 L.Ed.2d 848 (1992); *Ohio v. Roberts*, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–2540, 65 L.Ed.2d 597 (1980); *Reardon v. Manson*, 806 F.2d 39, 43 (2d Cir.1986), *cert. denied*, 481 U.S. 1020, 107 S.Ct. 1903, 95 L.Ed.2d 509 (1987). Reliability may be established either by showing that the evidence falls within a "firmly rooted" exception to the hearsay rule, *White v. Illinois*, — U.S. at — 112 S.Ct. at 743; *Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539, or by showing that the evidence has "particularized guarantees of trustworthiness," *id.*

■ Whether or not autopsy reports fall within an exception to the hearsay rule that is "firmly rooted," *see generally Manocchio v. Moran*, 919 F.2d at 777 (expressing doubts as to whether autopsy reports fall within a "firmly rooted" hearsay exception), we believe the reported observations in such reports bear sufficient indicia of reliability to satisfy the demands of the Confrontation Clause. We agree with the First Circuit's view that such observations have "particularized guarantees of trustworthiness" by virtue of (1) "the routine and repetitive circumstances under which such reports are made," (2) the fact that the reports are made contemporaneously with the autopsy itself, (3) "the existence of statutorily regularized procedures and established medical standards according to which autopsies must be performed and reports prepared," and (4) "the fact that autopsies are carried out in a laboratory environment by trained individuals with specialized qualifications." *Id.* at 778. We conclude that the admission of the Hambrick autopsy report did not violate the Confrontation Clause.

### 6. *Other Evidentiary Contentions*

Defendants' other evidentiary challenges include contentions that the court erred in admitting "other crimes" and hearsay evidence and in restricting their cross-examination of certain witnesses. None provides any ground for reversal.

### a. *"Other Crimes" Evidence*

The government offered the testimony of Melendez, 30 years of age at the time of trial, that he had first met Rosa when Melendez was 16 or 17 years old and that the two had stolen cars together. He also testified that in 1986 he had sold a few ounces of heroin to Rosa's then-partner in the drug trade. On appeal, Rosa argues that this evidence was not admissible under Fed.R.Evid. 404(b) because it was offered to show his propensity for crime, and that, in any event, it was unduly prejudicial and should therefore have been excluded pursuant to Fed.R.Evid. 403. We disagree.

■ The trial court has broad discretion to admit "other crimes" evidence under

Rule 404(b), and its ruling will not be overturned on appeal absent abuse of discretion. *See, e.g., United States v. Brennan,* 798 F.2d 581, 589 (2d Cir.1986), *cert. denied,* 490 U.S. 1022, 109 S.Ct. 1750, 104 L.Ed.2d 187 (1989). We have held repeatedly that it is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators. *See, e.g., United States v. Pitre,* 960 F.2d 1112, 1119 (2d Cir.1992); *see United States v. Roldan–Zapata,* 916 F.2d 795, 804 (2d Cir.1990), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991); *United States v. Brennan,* 798 F.2d at 589–90.

■ In this case, the evidence of Rosa's prior dealings with Melendez was properly admitted to explain how the illegal relationship between the two had developed and to explain why Melendez had appointed Rosa to a leading position in the Organization. The court properly instructed the jury that Rosa was not on trial for car thefts and that Melendez's testimony on that matter was being admitted only to establish the Melendez–Rosa association. The court also extended an offer, which Rosa declined, to give the jury a similar limiting instruction with regard to the 1986 drug sale. We see no error either in the admission of the testimony for this limited purpose or in the court's conclusion that the probative value of the evidence was not outweighed by its potential for unfair prejudice.

Rosa also argues that he was not given advance notice pursuant to Rule 404(b) of the government's intent to use this testimony. However, the notice requirement now in that Rule did not become effective until after the trial of this case.

b. *Hearsay as to the Burglary of Melendez's Apartment*

Defendants also contend that the district court improperly admitted hearsay evidence of a theft from Melendez's apartment. Melendez testified that, at the time of his arrest, he had approximately $3.5 million in cash in the apartment but that the police reported finding only $2.38 million. In order to explain the discrepancy, the government sought to elicit testimony from Melendez that he had learned that his apartment had been burglarized after his arrest. After a defense objection, the matter was discussed out of the hearing of the jury. The prosecutor expressed concern that defendants would allege that law enforcement agents had stolen the money. During this discussion, it transpired that Melendez did not have personal knowledge as to how much money was in his apartment just prior to his arrest; the money had been counted by his 16–year–old cousin Harold, who told Melendez how much there was. After the arrest, Melendez was told that "Harold or somebody" had been told by a security guard at Melendez's apartment building that a man matching the description of another Organization member, Arthur Boyce, had carted numerous items out of the apartment.

To the extent that Harold's statement to Melendez repeated what "Harold or somebody" had been told by a security guard, it was at the very least hearsay as to the content of the security guard's statement. The trial court nonetheless ruled that "[u]nless all defense counsel agree not to cross-examine on this point, I think the government is entitled to account for the money." (Tr. 3226.) Defense counsel declined, and the court permitted Melendez to testify as to what he had been told as to the amount of money in his apartment prior to his arrest and as to the burglary following his arrest. Although the court took the precaution of advising the jury that the testimony was hearsay and that the jury could thus discount it, we see no proper basis for allowing Melendez's testimony that there had been a burglary.

■ The government contends that defendants' refusal to forgo cross-examination regarding the discrepancy (1) bars them from challenging the court's ruling on appeal and (2) "opened the door" to the hearsay evidence. These contentions are frivolous. A defendant does not waive one right merely by refusing to waive another. Defendants had the right to cross-examine on the testi-

mony that had been given. Their refusal to cede that right cannot be a ground for barring them from objecting to the introduction of the inadmissible evidence that the government wished to add.

■ Nor does the refusal to forgo cross-examination "open the door" to inadmissible evidence. Indeed, the government's invocation of the "opening the door" principle is far wide of the mark. The rule of "opening the door," or "curative admissibility," gives the trial court discretion to permit a party to introduce otherwise inadmissible evidence on an issue (a) when the opposing party has introduced inadmissible evidence on the same issue, and (b) when it is needed to rebut a false impression that may have resulted from the opposing party's evidence. *See, e.g., United States v. Rea,* 958 F.2d 1206, 1225 (2d Cir.1991); *United States v. Brown,* 921 F.2d 1304, 1307 (D.C.Cir.1990); *United States v. Whitworth,* 856 F.2d 1268, 1285 (9th Cir.1988), *cert. denied,* 489 U.S. 1084, 109 S.Ct. 1541, 103 L.Ed.2d 846 (1989); 1 J. Wigmore, *Evidence* § 15 (Tillers rev. 1983). To be admissible under this doctrine, the evidence that allegedly "opened the door" must in fact have been inadmissible. Properly admitted evidence does not open the door to inadmissible evidence. *United States v. Rea,* 958 F.2d 1206, 1225 (2d Cir.1991); *United States v. Brown,* 921 F.2d 1304, 1307 (D.C.Cir.1990). These preconditions were not present here.

■ First, Melendez's testimony as to how much money Harold had told him was in the apartment was undoubtedly a coconspirator statement in furtherance of the conspiracy, *see* Fed.R.Evid. 801(d)(2)(E). Thus, it was properly admissible as nonhearsay and could not open the door to inadmissible hearsay. Second, and more importantly, even if the testimony as to Harold's statement had been inadmissible, it was introduced by the government itself. A party is not allowed to introduce inadmissible evidence in order to explain other inadmissible evidence that it, rather than its adversary, has introduced. The mere fact that the government wanted to present a satisfactory explanation for the missing money provided no justification for

permitting Melendez to testify to what was plainly excludable as hearsay.

■ Nonetheless, the admission of this testimony provides no basis for reversal, for the error was surely inconsequential. *See, e.g., Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946) (erroneous admission of evidence must be deemed harmless if appellate court can conclude with fair assurance that the evidence did not substantially influence the jury); *United States v. Rea,* 958 F.2d at 1220. The amount of money in Melendez's apartment just prior to his arrest was an entirely collateral matter. The person identified as the probable burglar was not one of these appellants. And even in the absence of any testimony by Melendez as to what might have happened to the supposedly missing funds, his silence on that point would not have led the jury to discredit the evidence of any government agent who testified at trial as to the crimes with which defendants were charged. Thus, any error by the district court in admitting the hearsay evidence of a burglary provides no basis for reversal.

### c. *Restrictions on Defendants' Cross-Examinations*

In addition, defendants contend that the trial court violated their Sixth Amendment confrontation rights and deprived them of a fair trial by limiting their cross-examinations of certain witnesses. Most of the rulings complained of were correct, and though a few were erroneous, we find no basis for reversal.

■ The "trial judge has 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, ... interrogation that is repetitive or only marginally relevant.' " *United States v. Maldonado–Rivera,* 922 F.2d 934, 956 (2d Cir.1990) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)), *cert. denied,* —— U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). The scope and extent of cross-examination are generally within the sound discretion of the trial court, and the decision to restrict cross-examination will not be reversed absent an abuse of discretion.

*See United States v. Caming*, 968 F.2d 232, 237 (2d Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 416, 121 L.Ed.2d 339 (1992); *United States v. Maldonado–Rivera*, 922 F.2d at 956; *United States v. Pedroza*, 750 F.2d 187, 195 (2d Cir.1984). "Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan–Zapata*, 916 F.2d at 806 (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980)). Even if we conclude that the trial judge has improperly curtailed cross-examination in violation of the defendant's confrontation rights, we are not to reverse automatically but are to apply harmless-error analysis, in order to determine "whether, assuming that the damaging potential of the cross-examination were fully realized," the error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1437. That is, we should not reverse if we conclude that the error was "unimportant in relation to everything else the jury considered on the issue in question." *Yates v. Evatt*, 500 U.S. 391, —, 111 S.Ct. 1884, 1893 (1991).

■■■■ Most of the rulings of which defendants complain were not erroneous. For example, the court did not abuse its discretion in excluding evidence proffered as showing inconsistencies in testimony that was not inconsistent, or in barring the impeachment of a witness with his supposed inability to identify Organization spots from photographs during the *Concepcion* trial, when the photographs with identification numbers from the *Concepcion* trial were not available, thereby creating the likelihood of confusion. Nor was it an abuse of discretion to exclude evidence of certain types of acts such as rape and burglary as having an insufficient bearing on the witness's credibility. *See, e.g., United States v. Rabinowitz*, 578 F.2d 910, 912 (2d Cir.1978) (unlawful sex acts); *United States v. Hawley*, 554 F.2d 50, 53 n. 7 (2d Cir.1977) (attempted burglary). For example, with respect to the testimony of Jerson Ramos that he had managed Organization spots in East New York and had worked with Rosa following Melendez's arrest, it was

not error to prevent Rosa from introducing evidence that Ramos had engaged in burglaries, for which he had never been arrested, on the theory that this was inconsistent with his testimony. As to crimes for which witnesses had been arrested, defendants were adequately allowed to bring out the witnesses' expectations of favorable treatment in exchange for their testimony.

■■■■ We also reject the contention that the trial court erred when it barred the questioning of cooperating witnesses as to what effect the Guidelines would have on their sentences. The court permitted cross-examination of those witnesses as to their plea agreements, the statutory maximum sentences they faced, and the benefits they hoped to gain from cooperation. The court was well within its discretion in ruling that the vagaries of Guidelines calculations were not a proper subject for cross-examination.

■■■■ We agree with defendants, however, that there were some errors. For example, Detective Peitler testified that an Organization runner identified in a November 1988 surveillance report as John Doe # 1 was in fact Lopez; another agent described an encounter with Lopez in May 1989, with respect to which the agent had filed a report referring to Lopez by name. Lopez sought to cast doubt on the testimony that he was the runner designated John Doe # 1 by recalling the second agent as a witness and offering, pursuant to Fed.R.Evid. 803(8), the police report prepared by that witness. He sought to show that in the first report, Peitler referred to the observed runner only as "John Doe # 1" even though Peitler had previously seen a photograph of Lopez; and that in the later report, Lopez was referred to by name without any indication that he had previously been identified as John Doe # 1. The trial court would not allow the reports to be introduced, stating, "this is your witness. You put him on direct examination. The government didn't put him on. You put him on. You are bound by his testimony." (Tr. 4382; *see also id.* 4415 ("You cannot put somebody on the witness stand and not get the answer you like and

then take him upon his reports and try to impeach him.").)

■ These rulings were erroneous. Rule 607 of the Federal Rules of Evidence provides that the "credibility of a witness may be attacked by any party, including the party calling the witness." In certain other instances, the court may have erred in not allowing defendants, in cross-examining government agents as to various events they testified they had observed, to introduce written reports by the agents that did not mention those events.

■ Nonetheless, we cannot conclude that any of these exclusions constituted reversible error, for in all instances the defendants were given adequate leeway to bring out sufficient information to permit the jury to make an accurate assessment of the witnesses' credibility. For example, in cross-examining Peitler, Lopez elicited Peitler's inability at the time of his report to identify John Doe # 1 as Lopez notwithstanding having seen a picture of Lopez previously. In addition, Lopez extensively cross-examined several other agents on differences between their descriptions of John Doe # 1 and Lopez's appearance. In another instance in which the witness's report was excluded from evidence, defendants were allowed to elicit an oral admission that that report did not mention the event in question. In other instances, challenged testimony was so strongly corroborated by other officers participating in the same surveillance who testified to the same observation, that it was highly unlikely that the jury would have drawn any adverse inference from the absence of mention of the event in the first agent's written report. We are convinced that the admission of the excluded reports would not have affected the jury's verdict.

In sum, we are unable to conclude that any errors in the trial court's evidentiary rulings, either singly or in combination, had any effect on the outcome of the trial.

**B. Challenges to the Sufficiency of the Evidence**

■ Several of the defendants contend that the evidence adduced at trial was insufficient to support certain of their convictions. The general principles governing review of such claims are well established. We

are to view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor, *see, e.g., Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Maldonado–Rivera,* 922 F.2d 934, 978 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991); *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983), and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *see, e.g., United States v. Skowronski,* 968 F.2d 242, 247 (2d Cir.1992); *United States v. Buck,* 804 F.2d 239, 242 (2d Cir.1986); *United States v. Taylor,* 464 F.2d 240, 244–45 (2d Cir.1972). A challenge to the weight of the evidence or the credibility of a witness is a matter for argument to the jury, not a ground for reversal on appeal. *See, e.g., United States v. Parker,* 903 F.2d 91, 97 (2d Cir.), *cert. denied,* 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990); *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). Thus, the defendant who makes a sufficiency challenge bears a heavy burden. Only Rosa, in challenging his conviction for attempted possession of heroin, has carried that burden in this case.

*1. Rosa's Conviction of Attempt*

■ In order to establish that a person is guilty of an attempt to commit a crime, the government must prove that he "(1) had the intent to commit the crime, and (2) engaged in conduct amounting to a 'substantial step' towards the commission of the crime." *United States v. Martinez,* 775 F.2d 31, 35 (2d Cir.1985). A "substantial step," although it may be less than the last act necessary before the actual commission of the substantive crime, entails "more than mere preparation." *United States v. Manley,* 632 F.2d 978, 987 (2d Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981);

*see also United States v. Cea,* 914 F.2d 881, 888–89 (7th Cir.1990). "[E]vidence of a verbal agreement alone, without more, is insufficient as a matter of law to support an attempt conviction." *United States v. Delvecchio,* 816 F.2d 859, 862 (2d Cir.1987).

In *Delvecchio,* the defendants who were charged with attempt to possess narcotics had met with a government agent and a government informant to negotiate a narcotics transaction. At the meeting, the defendants agreed to purchase 5 kilograms of heroin for $195,000 a kilogram; the sale was to occur on the following evening. However, the defendants failed to appear at the agreed meeting place and the transaction was never consummated. We held that these facts were insufficient to support the defendants' convictions for attempted heroin possession.

 Count 12 of the indictment charged that between June 1 and July 31, 1989, Rosa had attempted to possess heroin with intent to distribute it. This charge arose out of negotiations during that period between DEA Special Agent James Agee, acting undercover, and Rosa. Agee sought to purchase one kilogram of pure heroin from Rosa, who informed him that his Chinese suppliers provided heroin only in 700–gram bricks and would cost $112,000–$116,000 per brick. Although there was ample evidence of Rosa's participation in the Organization's activities, including his wholesale heroin purchases for resale by the Organization and his running of Organization spots grossing millions of dollars in retail sales, Rosa contends that there was no proof that he took any "substantial step" toward acquiring heroin for resale to Agee. The government states in its brief on appeal that "Rosa admitted" that he "sought out and found a drug supplier" (government's brief on appeal at 82); but it has provided us with no citation to the record where it contends such an admission was made, and our review of the transcript, viewed in the light most favorable to the government, has not revealed such evidence.

Agee testified on direct examination that he had a face-to-face conversation with Rosa at a mall and several telephone conversations with him thereafter, all contacts being initiated by Agee:

Q. Can you tell us what was discussed during the conversation at the Kings Plaza mall?

A. Basically I came down, I told Oscar that I was down there, that I had the money to purchase the heroin, which he acknowledged and he then later told me that he would get back with me.

Q. Did he tell you anything else?

A. He said no, he has to check his source and I was to give him a beep the next day to find out whether or not he had made contact.

. . . .

Q. What else did he say?

A. I was to beep him the next day to see if in fact he made contact.

Q. Did you in fact speak with Mr. Rosa again?

A. Yes, I did.

Q. When was that?

A. That was a couple of weeks afterwards I spoke to him on the phone.

Q. Did you beep him?

A. Yes.

. . . .

Q. Were you able to record that conversation?

A. No, I wasn't.

. . . .

Q. What was said during that conversation?

A. I had asked him what was the problem, had he made contact with his source or not and he was saying that he had approximate [*sic*] with his source, he thinks his source might have been locked up.

Q. Did you ever do the deal with Mr. Rosa?

A. No, I did not.

(Tr. 888–90.) Agee's testimony on cross-examination was similar:

Q. So it's clear that [the first] conversation is just preliminary negotiations; isn't that correct?

A. That's correct.

Q. And the fact is that when you left then, nothing came of that; isn't that right?

A. Nothing came of what?

Q. After June 27, Mr. Rosa never got in touch with you?

A. That's correct.

Q. Until a period of time passed according to you until July 10 when you made another call?

A. That's correct.

Q. So he certainly made no attempt to reach out to you; isn't that right?

A. That's correct.

. . . .

Q. Now, on July 10 and July 11 you also had conversations; isn't that right?

A. That's correct.

Q. And again Mr. Rosa didn't initiate the contact with you; isn't that right?

A. That's correct.

Q. And in fact you said when you met on the eleventh that you would see him the next day; isn't that right?

A. I'll reach out for him, I said, that's correct.

Q. And it's your testimony that you had the money on the eleventh; isn't that correct?

A. That's correct.

Q. And Mr. Rosa said that he had to touch base with his source or something; isn't that correct?

A. That's correct.

. . . .

Q. Did you ask him to go and get the drugs on July 11?

A. Did I ask him to go and get them?

Q. Yes.

A. Not in that term, no.

Q. In fact you put it off for another day and said I'll call you tomorrow; isn't that right?

A. No. He put me off. He had things that he had to reach out and check his source and get back with him.

Q. This putting you off is also consistent with his wanting to do any kind of drug deal; isn't that right?

A. As far as my knowledge, no.

. . . .

Q. And it's also your testimony that . . . during that entire period of time you never purchased any narcotics from Mr. Rosa; isn't that right?

A. That's correct.

Q. And in fact, you never came to any agreement with Mr. Rosa as to any meeting where the money and the drugs would be together; isn't that right?

A. That's correct.

. . . .

Q. Did you ever receive any contraband from Mr. Rosa as a result of your talking to him?

A. No, I did not.

Q. Did you ever give him any money as a result of your conversations?

A. No.

(Tr. 907–10.)

This testimony did not reveal a substantial step by Rosa toward acquiring heroin for resale to Agee, for Rosa is described merely as saying at the outset that he needed to check with his supplier and saying at the end that his supplier might be in jail. Agee did not testify that Rosa claimed to have entered into an agreement with a supplier for heroin to sell to Agee, or even that Rosa said he had made an inquiry of a supplier for that purpose. Agee's testimony thus provides no support for the government's claim that "Rosa admitted" that he "sought out and found a drug supplier."

The only other evidence cited by the government in support of its contention that Rosa took a substantial step toward acquiring heroin for sale to Agee is the testimony of cooperating witness Jerson Ramos. Ramos, a manager of Organization spots in East New York in the summer of 1989, attributed Rosa's failure to make the proposed sale to Agee to a statement by Rosa that "since the Chinese were hot nobody wanted to sell." (Tr. 600.) According to the government's evidence and theory of the case, however, Rosa was one of three Organization members responsible for purchasing heroin for the Organization's retail sales; there was nothing in

Rosa's statement, as Ramos described it, that indicated that Rosa had made any effort to obtain heroin from his Chinese sources in order to sell it to Agee. Ramos himself offered no first-hand evidence that Rosa had made any such effort; nor did he testify that Rosa said he had made any inquiries as to the availability of heroin for resale to Agee.

In sum, Rosa did not produce any heroin for the proposed sale to Agee, and there was no evidence that Rosa ever entered into an agreement with a supplier or made inquiry of a supplier to obtain heroin for the proposed sale to Agee. The evidence provided no basis on which a rational juror could have found beyond a reasonable doubt that Rosa had taken a substantial step toward possessing heroin for resale to Agee, and it therefore was insufficient to support Rosa's conviction for attempt.

Accordingly, we reverse Rosa's conviction on count 12 and remand for dismissal of that count. Since it is unclear what effect, if any, acquittal on that count has on his sentence, we vacate the judgment and remand for resentencing.

### 2. *Hernandez's Conspiracy and § 1959 Convictions*

Hernandez makes two sufficiency challenges. First, he contends that there was insufficient evidence to support his conviction of conspiracy, arguing that in 1989 he was a competitor, not a member, of the Organization, and that in any event the evidence showed that the Organization consisted of multiple independent conspiracies, not one overall conspiracy. Second, he contends the evidence was insufficient to establish that he murdered Hambrick and that he did so in order to maintain or increase his position in the Organization in violation of 18 U.S.C. § 1959. We reject his challenges.

■■■ The matter of whether the evidence has established one conspiracy or more than one is a question of fact for a properly instructed jury. *See, e.g., United States v. Aracri,* 968 F.2d 1512, 1519 (2d Cir.1992); *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1192 (2d Cir.), *cert. denied,* 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314

(1989); *United States v. Alessi,* 638 F.2d 466, 472 (2d Cir.1980). We cannot disturb the jury's verdict if the evidence, viewed in the light most favorable to the government, could have led a reasonable juror to conclude beyond a reasonable doubt "(1) that the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment, and (2) that the defendant participated in the alleged enterprise with a consciousness of its general nature and extent." *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d at 1192.

■■■ There was ample evidence from the many accomplice witnesses, who testified as to the Organization's activities, from which a rational juror could have inferred that there was one conspiracy, rather than several. Hernandez has made no challenge to the instructions given to the jury on this issue. Further, though there was some indication that Hernandez was not a member of the Organization in 1987 or 1988, there was also ample evidence that Hernandez, who had first joined the Organization in 1986, was running Organization spots in 1989 with Lopez and two other long-time Organization members. Thus, a reasonable juror could have concluded beyond a reasonable doubt that in 1989 Hernandez was running spots on behalf of, rather than in competition with, the Organization.

■■■ Hernandez's challenge to his § 1959 conviction for the Hambrick murder is also meritless. When Hernandez became an Organization worker in 1986 he performed many lower-level tasks; he rose to become one of its leaders in the summer of 1989. On Labor Day in 1989, Hernandez killed Hambrick, an Organization lookout for a spot run by Hernandez. An eyewitness testified that he saw Hernandez, who was armed, arguing with Hambrick, who was unarmed. The eyewitness saw Hernandez, in the course of that dispute, shoot Hambrick four or five times until his gun clicked empty; the witness then saw Hambrick lying on the ground. The first police officer to arrive on the scene found Hambrick lying in the same position, dead. The autopsy report stated the observations that Hambrick had sustained gunshot wounds to, among other places, his chest.

After Hernandez was apprehended, he said that his dispute with Hambrick related to the spot. The evidence was plainly ample to permit a rational juror to conclude that Hernandez murdered Hambrick and did so for the purpose of maintaining or increasing his position in the Organization.

### 3. Other Sufficiency Challenges

██ The other defendants' sufficiency challenges have no merit. Lopez contends that there was insufficient evidence to support his conviction because all the witnesses against him were committing perjury. His perjury claim is unsupported, and his arguments that the witnesses' testimony should not have been credited is an argument for the jury, not a ground for reversal on appeal.

██ Rodriguez's claim that there was insufficient evidence to support his convictions for narcotics possession and conspiracy with intent to distribute is frivolous. He was caught after fleeing from the Roebling Street mill during the raid; agents who conducted the raid noted that the objects in the mill were covered with a residue of white powder; when apprehended in the apartment below the mill, Rodriguez was covered with white powder; Rodriguez's name appeared on Organization employee time records; and four accomplices identified him as an Organization millworker.

### C. Other Challenges to the Convictions

Defendants make numerous other challenges to their convictions, including challenges to pretrial denials of severance motions, challenges to limitations on cross-examination, and contentions that conduct by the trial court and the prosecutor deprived them of a fair trial. These contentions are meritless.

### 1. The Severance Contentions of Rosa and Rodriguez

Rosa and Rodriguez contend that the district court should have granted their pretrial motions for severance of their trials from the trial of their codefendants in order to ensure them a fair trial. They argue that they suffered prejudicial spillover from the evidence of their codefendants' acts of violence. We find no basis for reversal.

██ A defendant challenging a district court's denial of a severance motion bears a heavy burden. In order to secure a reversal, he must show prejudice so severe that his conviction constituted a miscarriage of justice, see, e.g., United States v. DeVillio, 983 F.2d 1185, 1192 (2d Cir.1993); United States v. Lasanta, 978 F.2d 1300, 1306 (2d Cir.1992), and that the denial of his motion constituted an abuse of discretion, see, e.g., Zafiro v. United States, —— U.S. ——, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993); United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir.1989), cert. denied, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990).

██ The principles that guide the district court's consideration of a motion for severance usually counsel denial. Since there is a preference, in the federal system, for the joint trial of defendants indicted together, the district court should grant a severance motion only if there is a serious risk that a joint trial would compromise a specific trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence. See Zafiro v. United States, —— U.S. at —— ——, 113 S.Ct. at 937–38. A defendant's right to a fair trial does not include the right to exclude relevant and competent evidence. Id. Thus, the fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately. See id. Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial, see, e.g., United States v. Villegas, 899 F.2d 1324, 1347–48 (2d Cir.), cert. denied, 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990); United States v. Bari, 750 F.2d 1169, 1178 (2d Cir.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

██ In the present case, though Rosa and Rodriguez personally were not charged with acts of violence, the evidence was ample

that each of them was an integral part of the conspiracy, Rodriguez as a heroin processor, and Rosa as a principal wholesale purchaser of heroin for the Organization, a seller of millions of dollars worth of drugs at Organization spots, and the procurer of weapons for the Organization. Evidence of the workings of the conspiracy would therefore have been admissible at the individual trials of Rosa or Rodriguez, had they been tried separately. Since the evidence was that the Organization's routine modus operandi involved the use of murder and mayhem to exclude competitors from its retail drug spots and to maintain discipline among its members, the acts of violence performed by other coconspirators were chargeable to Rosa and Rodriguez, and their claims of prejudicial spillover must be rejected.

The trial court instructed the jury that it should consider the evidence as to each count of the indictment separately and advised it that the fact that it found any one defendant guilty on a given count "should not control your verdict as to any other offenses charged." And with the exception of Rosa's conviction for attempted heroin possession, *see* Part II.B.1. above, there was ample evidence supporting the jury's verdicts of guilty.

### 2. *Velasquez's Request for a "Missing–Witness" Instruction and His Challenge to the Summation*

There was evidence at trial that Victor Spaventa, a brother of Velasquez, had also been employed by the Organization at its mills. Velasquez, who called other witnesses to testify that Velasquez himself was not working in an Organization mill in early 1989, argues (a) that the court should have instructed the jury that since his brother was not called as a witness, the jury could infer that his brother's testimony would have been unfavorable to the government, and (b) that the government's rebuttal summation, mentioning that Velasquez himself had not called Spaventa to testify, was improper. These contentions are meritless.

■ First, Velasquez did not object to the trial court's instruction to the jury that the absence of any witness should not be taken as an indication as to how that witness would have testified, and hence his missing-witness contention in this Court is reviewable only for plain error. *See, e.g., United States v. Pabisz,* 936 F.2d 80, 83 (2d Cir.1991). Insofar as the trial court's instruction dealt with Spaventa, it not only was not plain error, it was not error at all. A missing-witness charge such as that requested by Velasquez is not appropriate if both sides have the ability to compel the witness's appearance. *See, e.g., United States v. Erb,* 543 F.2d 438, 444–45 (2d Cir.), *cert. denied,* 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976). At the trial in the present case, the government indicated that Spaventa, though not available that day, could be produced on the following Monday. There is no indication that Velasquez himself could not have had Spaventa produced as a witness in his behalf at that time. Indeed, Velasquez later, at his sentencing hearing, did produce Spaventa as a witness. Accordingly, the missing-witness instruction Velasquez sought at trial would have been improper.

■ Finally, the AUSA, in his rebuttal summation querying why Velasquez had not called Spaventa as a witness, was careful not to suggest that Velasquez had any burden of proof or any obligation to adduce any evidence whatever. The comments were well within the boundaries set by this Court in such cases as *United States v. Bubar,* 567 F.2d 192, 199 (2d Cir.) (government may comment on the failure of defendant to refute government evidence or to support his own claims, so long as its remarks could not be construed as a comment on the defendant's failure to testify or as a suggestion that the defendant has any burden to produce evidence), *cert. denied,* 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977), and *United States v. Parker,* 903 F.2d 91, 97–99 (2d Cir.), *cert. denied,* 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990) (questions as to why defendant had not summoned his sister to testify held not a basis for reversal since the prosecutor had begun that portion of summation by noting that the defendant had no obligation to call any witness and that the burden rested solely on the government to prove his guilt beyond a reasonable doubt, and court gave cautionary instruction to jury

"not to speculate as to why a particular defendant did or did not call a particular potential witness"). *See also United States v. Walker,* 835 F.2d 983, 988–89 (2d Cir. 1987); *United States v. Cruz,* 797 F.2d 90, 93 n. 1 (2d Cir.1986); *United States v. Pelusio,* 725 F.2d 161, 168 (2d Cir.1983).

### 3. *The Challenge to the Trial Court's Conduct*

Lopez contends that the district court made a number of "one-sided improper rulings" and "denigrat[ed]" his counsel at trial, and thereby "sent a clear improper message to the jury that Lopez's counsel was unworthy of belief and unethical and gave the impression that the court favored the government." (Lopez brief on appeal at 66–67.) We find no basis for reversal.

 In reviewing a challenge to a trial judge's conduct, this Court's role is "not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." *United States v. Pisani,* 773 F.2d 397, 402 (2d Cir.1985). The court's comments and rulings may not be viewed in isolation but must be evaluated in light of the record as a whole. *See, e.g., United States v. Manko,* 979 F.2d 900, 905–07 (2d Cir.1992) (affirming judgment despite a few instances in which court's conduct crossed the line in questioning witnesses), *cert. denied,* —— U.S. ——, 113 S.Ct. 2993, 125 L.Ed.2d 687 (1993); *United States v. Mazzilli,* 848 F.2d 384, 388–89 (2d Cir.1988) (new trial ordered where court, by the manner of its intensive questioning of defendant, "communicated to the jury its impression that his testimony was unworthy of belief").

 In the present case, although a few of the trial court's evidentiary rulings were erroneous, *see* Point II.C.2. above, and some of its admonitions to trial counsel were curt and critical, at least some of the criticisms were warranted, and none of the comments suggested endorsement of any witness's testimony or revealed any bias against any defendant. We have examined the record, and we are satisfied that neither the few evidentiary errors nor the dozen-or-so cited criticisms, during the course of this two-month trial, deprived defendants of a fair trial.

### D. *Challenges to Sentencing*

Defendants raise several challenges to their sentences, including a challenge by Rosa to the court's imposition of a fine and challenges by the other defendants to offense-level adjustments for their roles in the offense. In addition, Rosa and Lopez contend that the court failed to state reasons for their sentences; and Rodriguez, Hernandez, and Velasquez challenge the court's calculation of the quantity of narcotics attributable to them. For the reasons below, we find merit only in the contentions of Rodriguez and Hernandez that the court did not make findings as to their roles, and in the contention of Rosa that the court did not explain why it sentenced him at the top of the Guidelines range.

### 1. *The Quantity of Heroin*

 Any contention that the court erred in calculating the base offense level of these defendants on the basis of more than 10 kilograms of heroin is frivolous. Under the Guidelines, the base offense level for narcotics offenses " 'is to be calculated after taking into account the entire quantity involved in the defendant's demonstrated narcotics activity.' " *United States v. Rivera,* 971 F.2d 876, 892 (2d Cir.1992) (quoting *United States v. Schaper,* 903 F.2d 891, 898 (2d Cir.1990)). A defendant who participates in jointly-undertaken narcotics activity is to be held accountable for the reasonably foreseeable conduct of others in furtherance of that activity. *See United States v. Joyner,* 924 F.2d 454, 459 (2d Cir.1991).

 The evidence at trial was overwhelming that the conspiratorial activity involved more than 10 kilograms of heroin. It included evidence that a mill in which Velasquez worked produced 6 kilograms of heroin per week; that Hernandez obtained some 700 grams of heroin a week for the Organization in 1986; that Rosa obtained only 700–gram blocks of pure heroin from his Chinese

suppliers; and that Melendez himself, in the four months just prior to his arrest, grossed $8–10 million.

### 2. *Roles in the Offense*

██ The presentence report ("PSR") prepared on Hernandez recommended a four-step increase in his offense level pursuant to Guidelines § 3B1.1(a) for his leadership role in the offense. Hernandez objected to this characterization. The court made no finding with respect to his role. Accordingly, we vacate Hernandez's sentence and remand for a factual finding on that issue.

The PSR prepared on Rodriguez recommended reduction of his offense level by two points pursuant to Guidelines § 3B1.2(b) because of his minor role in the offense. Rodriguez contended that he was entitled to a four-step reduction because his role was minimal rather than minor. Since the court made no finding on this issue, we also vacate Rodriguez's sentence and remand for a factual finding.

We reject the challenges of Lopez and Velasquez to the district court's three-point increases in their offense levels pursuant to Guidelines § 3B1.1(b) for their managerial or supervisory roles. The court made findings as to their roles as managers or supervisors, and, given the evidence at trial, those findings are not clearly erroneous, *see* 18 U.S.C. § 3742(e) (1988).

### 3. *The $1,000,000 Fine on Rosa*

██ Rosa challenges the court's imposition on him of a $1,000,000 fine. We find no basis for reversal. Section 5E1.2 of the Guidelines provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." Guidelines § 5E1.2(a). In imposing a fine, a court is to consider, *inter alia,* "the defendant's income, earning capacity, and financial resources." 18 U.S.C. § 3572(a)(1) (1988). The court must afford the defendant at least a minimal opportunity to show that he lacks the ability to pay the fine proposed by the court. *See United States v. Marquez,* 941 F.2d 60, 65–66 (2d Cir.1991). Generally, if the "defendant is represented by (or was determined eligible for) assigned counsel," that fact is a "significant indicator[ ] of present inability to pay any fine." Guidelines § 5E1.2 Application Note 3.

██ In the present case, although Rosa was represented by assigned counsel, that fact was not dispositive. The PSR revealed that Rosa had received 30% of the proceeds from three lucrative Organization spots, that he refused to disclose his earnings from his auto body repair shop, and that he was part owner of a home in Puerto Rico. The PSR concluded that Rosa was "not entirely forthright" and that there was no support for his claim to be unable to pay a fine. We are not persuaded that in these circumstances, the court erred in imposing the fine.

### 4. *Explanations for Sentences Within Range Exceeding 24 Months*

██ Finally, Rosa and Lopez contend that the district court failed to explain the reasons for their sentences as required by 18 U.S.C. § 3553(c). That section requires that when a defendant is sentenced within a Guidelines range that spans more than 24 months, the sentencing court must state its reasons for the imprisonment period chosen within that range. We have interpreted this provision to require the sentencing judge to articulate a reason that demonstrates that he "thoughtfully discharged his statutory obligation, with a degree of care appropriate to the severity of the punishment ultimately selected." *United States v. Chartier,* 933 F.2d 111, 117 (2d Cir.1991). It is sufficient for the court to advert to a given factor or factors in selecting a point within the range. *See, e.g., United States v. Lopez,* 937 F.2d 716, 728–29 (2d Cir.1991) (statement that though court would not depart on ground of defendant's attempt to mislead probation department, it would take that attempt into account in selecting sentence within the Guidelines range, was sufficient); *United States v. Rivera,* 971 F.2d 876, 895 (2d Cir. 1992) (description of defendant as very violent and very dangerous and statement that his criminal history category did not appear to reflect adequately the seriousness of his

past conduct or the likelihood of recidivism, followed by statement that court had chosen top of Guidelines range "for the reasons I indicated," was sufficient). On the other hand, it is not sufficient for the court to "stat[e] simply, 'I have considered everything.'" *United States v. Zackson*, 6 F.3d 911, 923 (2d Cir.1993). Nor is it sufficient for the court to indicate only why it has not sentenced at the bottom of a greater–than–24–month range without indicating why it has sentenced at the top. *See United States v. Chartier*, 933 F.2d at 117.

We conclude that the court adequately stated reasons as to Lopez but not as to Rosa. With respect to Lopez, the Guidelines recommended a range of 324–405 months' imprisonment, and the government sought an upward departure, noting (a) that though Lopez was not charged in the indictment with having obtained weapons unlawfully, the evidence showed he had done so, and (b) that Lopez was charged in the indictment with only some of the acts of violence that the trial evidence showed he had committed. At Lopez's sentencing hearing, the district court stated that it had heard and believed the evidence presented at trial, including that recounted by the government in its presentations with regard to sentencing. After adverting in particular to evidence that Lopez had, *inter alia*, supplied weapons to Organization members and participated in near-murderous acts of violence as disciplinary measures, the court stated that it would not depart upward, but that "[i]n light of all the evidence I am going to sentence your client to the top end of the range." (Lopez Sentencing Transcript, October 25, 1991, at 22.) We conclude that the court sufficiently stated its reasons for selecting the point within the Guidelines range.

With respect to Rosa, however, for whom the Guidelines recommended a range of 360 months to life imprisonment, the court's statements were minimal. Rosa's attorney Charles Donovan urged the court to sentence Rosa at the bottom of the Guidelines range. The government urged the court to note the Organization's size, profitability, and history of murders and violent beatings and to note that Rosa had main-

tained his position as a lieutenant under three of the Organization's leaders. The AUSA concluded, "It is for that extraordinary role that Mr. Rosa should be adequately punished." The court stated, "I don't see any mitigating circumstances here, Mr. Donovan. I am going to sentence him to the maximum permitted by the guidelines...." (Rosa Sentencing Transcript, November 1, 1991, at 5.) Unlike the statements made at the Lopez sentencing hearing, the court at Rosa's hearing did not expressly adopt the government's description of Rosa's role, or refer to any specific aspect of Rosa's behavior, or advert to any or all of the evidence at trial. And though the statement that there were no mitigating circumstances explained the court's rejection of Rosa's plea for a sentence of 360 months, it did not explain why the court did not sentence him at some point in the range that was between the bottom and the top. We conclude that the court's reason for sentencing Rosa at the top of the Guidelines range was not explained sufficiently to comply with § 3553(c).

## CONCLUSION

We have considered all of defendants' contentions on these appeals, and, except to the extent indicated above, have found them to be without merit. Rosa's conviction on count 12 for attempted possession of heroin is reversed, and the matter is remanded for (a) dismissal of that count of the indictment, (b) recalculation of his sentence in light of that dismissal, and (c) an explanation by the court of its reason for sentencing Rosa to a given prison term within a Guidelines range that exceeds 24 months. The sentences of Rodriguez and Hernandez are vacated and the matters are remanded for findings as to their roles in the offense. In all other respects, the judgments of conviction are affirmed.