David TUCKER, Petitioner,

v.

Floyd BENNETT, Superintendent, Elmira Correctional Facility, Respondent.

No. CV 97–2332(RR).

United States District Court, E.D. New York.

July 24, 2002.

---

4. As noted above, Rumpler has not asked for any specific discovery related to this claim.

(*See* note 2, *supra*.)

David Tucker, Elmira Correctional Facility, Elmira, Petitioner, Pro Se.

Honorable Charles J. Hynes, Kings County District Attorney, Brooklyn, By Ann Bordley, Esq., Assistant District Attorney, Counsel for Respondent.

### Memorandum and ORDER

RAGGI, District Judge.

David Tucker, proceeding pro se, petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1994 & Supp.2001). Tucker was convicted in 1991 after a jury trial in New York Supreme Court, Kings County, of Murder in the Second Degree, N.Y. Penal Law § 125.25[3] (McKinney 1998), Attempted Robbery in the First Degree, N.Y. Penal Law § 110 (McKinney 1998) and § 160.15 (McKinney 1999), and Criminal Possession of a Weapon in both the Second and Third Degree, N.Y. Penal Law § 265.03[2] & [4] (McKinney 2000). Tucker is presently incarcerated, having been sentenced as a second felony offender to concurrent prison terms of twenty-five years to life on the murder count, seven and one-half to fifteen years on the attempted robbery and second-degree weapon counts, and three and one-half to seven years on the third-degree weapon count.

In his petition to this court, Tucker challenges his conviction on the grounds that he was denied (1) his Sixth Amendment right to ·confront the medical examiner who prepared the victim autopsy report, and (2) his due process right to a fair trial as a result of (a) prosecutorial misconduct in opening and closing statements, (b) erroneous jury instructions, and (c) improper limits on defense cross-examination of two witnesses.

Having carefully reviewed the parties' submissions, as well as the record of proceedings in the state courts, this court denies Tucker's petition as without merit.

### Factual Background

1. *The Attempted Robbery and Murder of Rena Hampton*

At approximately 8:30 p.m. on April 11, 1990, petitioner David Tucker approached a car parked on Cornelia Street in Brooklyn and demanded that the woman seated inside, Rena Hampton, give him her money and drugs. Ms. Hampton, a neighborhood crack dealer, refused and a physical fight ensued. Within seconds, Tucker was joined by co-defendant Richard Haynes, who pointed a sawed-off shotgun at Ms. Hampton and repeated the robbers' demands. When Ms. Hampton continued to resist, Tucker directed Haynes to "blast her," Trial Trans. at 235, 358, whereupon Haynes shot Ms. Hampton in the neck causing her immediate death.

2. *Arrest and Police Interview*

Three persons who saw or heard events relevant to the Hampton robbery and murder were questioned by police: Ricardo Soto and Bolivio Vega Martinez, who were working on the car in which Ms. Hampton was sitting when Tucker and Haynes approached her; and Cornelius McNeil, a thirteen-year old delinquent who was on the street at the time of the crime. Each would subsequently testify at trial. McNeil specifically identified the robbers as men he recognized from the neighborhood, and it was based on his identification

that Tucker and Haynes were arrested within hours of the Hampton murder.

In a post-arrest statement made after advice of rights, Tucker admitted that he had approached Ms. Hampton on Cornelia Street but insisted that his singular purpose was to buy drugs. Tucker explained that after making his purchase, he started to leave the scene when he heard Haynes arguing with the woman, followed by a gunshot. Tucker subsequently repeated these statements on a videotape that the prosecution offered into evidence at trial.

### 3. *Jury Verdict and Appeal*

On April 19, 1991, the jury unanimously found Tucker guilty of second degree murder, first degree attempted robbery, and criminal possession of a weapon in the second and third degrees. On May 16, 1991, the court sentenced him to the terms previously indicated.

Through newly appointed counsel, Tucker challenged his conviction on direct appeal, citing eight grounds: (1) violation of his right to confront the medical examiner who prepared the victim autopsy report, (2) prosecutorial misconduct, (3) improper jury charge, (4) improper limits on defense cross-examination, (5) insufficiency of the evidence, (6) defect in the indictment, (7) excessive sentence, and (8) ineffective assistance of counsel.

On September 27, 1993, the Appellate Division rejected these arguments and unanimously affirmed Tucker's conviction. *See People v. Tucker*, 196 A.D.2d 902, 602 N.Y.S.2d 399 (2d Dep't 1993). Specifically, the court ruled that the evidence was sufficient to establish Tucker's guilt beyond a reasonable doubt, that hearsay rules precluded defense counsel from questioning a

law enforcement witness about Tucker's exculpatory post-arrest statement, and that defense counsel was constitutionally effective. *See id.* All remaining challenges were summarily rejected as "either unpreserved for appellate review or without merit." *Id.*

On October 19, 1993, Tucker's counsel moved the New York Court of Appeals for leave to appeal, specifically requesting further review of five of his appellate points: (1) violation of his right to confront the medical examiner, (2) prosecutorial misconduct, (3) improper jury charges, (4) improper limits on defense cross-examination, and (5) ineffective assistance of counsel. *See* Ex. D to Respondent's Opposition at 2–3. The Court of Appeals summarily denied the motion on November 29, 1993. *See People v. Tucker*, 82 N.Y.2d 854, 606 N.Y.S.2d 606, 627 N.E.2d 527 (1993) (Bellacosa, J.).

### 4. *Federal Habeas Petition*

In a submission dated April 22, 1997, Tucker petitioned this court for a writ of habeas corpus.[1] Respondent moved to dismiss the petition as untimely in light of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, 1220 (1996). Because AEDPA does not specifically address the application of its one-year time limitation to petitioners such as Tucker, whose convictions became final before enactment of that statute, this court had initially concluded that applications from such petitioners should be entertained if filed within one year from AEDPA's April 24, 1996 effective date. That approach was called into question, however, by *Peterson v. Demskie*, 107 F.3d

---

1. Since a § 2254 petition is deemed to have been filed on or about the date it is delivered to prison officials for transmittal to the court, *see Houston v. Lack*, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988), and since this

court assumes that Tucker's petition was so delivered on the date he signed it, i.e., April 22, 1997, that date is considered the date of filing.

92, 92–93 (2d Cir.1997), wherein the Court of Appeals suggested that petitioners challenging pre-AEDPA convictions were not necessarily entitled to a full year to file for relief, but only to a "reasonable time" after the statute's effective date. Relying on *Peterson,* this court dismissed Tucker's petition on December 15, 1997, finding its April 22, 1997 filing not to have been within a reasonable time. The following year, in *Ross v. Artuz,* 150 F.3d 97 (2d Cir.1998), the Second Circuit rejected as dicta the "reasonable time" standard discussed in *Peterson* and joined the majority of other circuits in holding that petitioners whose convictions became final before the enactment of AEDPA should be afforded a one-year grace period from the effective date of the statute to file collateral challenges. In light of *Ross,* the Circuit vacated this court's dismissal of Tucker's petition and remanded the case for further proceedings.

### Discussion

#### I. Standard of Review

This court's review of Tucker's petition is governed by the standards articulated in AEDPA, which significantly amended the federal habeas corpus statute, 28 U.S.C. § 2254. Subsection (d) of § 2254 now provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1994 & Supp. IV 1998).

In *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court provided some guidance for lower courts in applying these standards. Justice O'Connor, writing for a majority, stated that the phrase "clearly established Federal law, as determined by the Supreme Court of the United States" in subpart (1) should be understood to refer to "the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." *Id.* at 412, 120 S.Ct. 1495. The Court then identified two circumstances under which a state court decision could be deemed "contrary to" clearly established Federal law: when the state court (1) "arrives at a conclusion opposite that reached by [the Supreme Court] on a question of law," or (2) "decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Id.* at 413, 120 S.Ct. 1495.

As to the alternative "unreasonable application" clause in subpart (1) of § 2254(d), the Court held that habeas relief was warranted only "if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The Court ruled that reasonableness was to be assessed objectively rather than subjectively. *See id.* Moreover, whatever difficulty there might be in defining the term "unreasonable," courts were cautioned that "an *unreasonable* application of federal law" did not equate with "an *incorrect* application of federal law." *Id.* at 410, 120 S.Ct. 1495. Thus, a "federal habeas court may not issue the writ simply because that court concludes in its independent judg-

ment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495; *see also Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000) (cautioning that while "[s]ome increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence" (quotation omitted)). Further, as long as the state court disposes of the federal claim on the merits and reduces its disposition to judgment, the deference demanded of a federal habeas court by § 2254(d)(1) applies "even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001).

Applying these principles to this case, it is apparent that Tucker is not entitled to habeas corpus relief.

## II. *The Merits of Petitioner's Claims*

### A. *Procedural Challenge*

█ Respondent argues that certain of Tucker's claims are procedurally barred from federal review either because they were not fully exhausted in the state courts or because they were defaulted. These procedural challenges warrant little discussion since, in any case, Tucker's claims are without merit. While 28 U.S.C. § 2254(b)(1)(A) does state that a federal habeas court may not entertain a collateral challenge to a state judgment unless petitioner "has exhausted the remedies available in the courts of the States," another subpart of that same statute permits the denial of non-meritorious petitions "notwithstanding the failure of the applicant to exhaust" state remedies. 28 U.S.C.

§ 2254(b)(2). Similarly, although procedurally defaulted claims should not be addressed unless a petitioner can show either (1) good cause to excuse the default and ensuing prejudice or (2) a miscarriage of justice, *see Aparicio v. Artuz,* 269 F.3d 78, 90 (2d Cir.2001); *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991), neither standard can be met when, as in Tucker's case, the claims at issue are plainly without merit.

### B. *Right to Confront Medical Examiner*

In proving that Ms. Hampton died from a bullet wound to her neck, the prosecution relied on the autopsy report of a medical examiner who was no longer available as a witness as well as the testimony of another medical examiner who, upon review of the report, offered expert opinion as to the cause of death. Although Tucker raised no objection to this evidence at trial and virtually conceded the cause of death,[2] he now asserts that the prosecution's failure to call the medical examiner who actually prepared the autopsy report violated his Sixth Amendment right of confrontation. This court disagrees.

█ As the Second Circuit ruled in rejecting a Confrontation Clause challenge in *United States v. Rosa,* 11 F.3d 315, 333 (2d Cir.1993), the factual observations in a medical examiner's autopsy report have sufficient "indicia of reliability" to be admitted as a business record regardless of whether or not the examining pathologist testifies at trial. *See Manocchio v. Moran,* 919 F.2d 770, 777–78 (1st Cir.1990) (same). Thus, this part of the medical examiner's report was clearly admissible in Tucker's case.

---

**2.** In summation, defense counsel stated, "Certainly there was a weapon and certainly Ms. Hampton was shot." Trial Trans. at 593. He argued that the evidence was insufficient to prove that his client participated in the robbery wherein Ms. Hampton was killed.

The Hampton autopsy report did, however, also contain the examiner's opinion about the cause of the victim's death. In *Rosa*, the Second Circuit ruled that in cases where the examining pathologist does not testify, such conclusions should be redacted from autopsy reports. *See United States v. Rosa*, 11 F.3d at 333; *People v. Violante*, 144 A.D.2d 995, 996, 534 N.Y.S.2d 281 (4th Dep't 1988) (same). Tucker did not request any such redaction in his case. To the extent the trial court's failure sua sponte to order redaction constituted error, however, it was plainly harmless beyond a reasonable doubt, *see Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and, certainly, petitioner sustained no "actual prejudice," *Brecht v. Abrahamson*, 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See Fuller v. Gorczyk*, 273 F.3d 212, 221 (2d Cir.2001) (leaving open the question of whether errors reviewed under § 2254 are subject to *Chapman* or *Brecht* analysis, but noting the Supreme Court's application of *Chapman* to a Confrontation Clause error in *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

The admissible facts in the autopsy report overwhelmingly demonstrated that Ms. Hampton died from a gunshot wound. A two and one-half inch wound was found in the victim's neck that cut through to her carotid artery, damaged her larynx, trachea, left jugular vein, and left and subclavical blood vessels. Stippling, consistent with the firing of a gun at close range, was noted around the neck hole. These objective autopsy findings were, moreover, consistent with the testimony of various eyewitnesses who saw or heard a gunshot fired seconds after Tucker told his confederate Haynes to "blast" Ms. Hampton. Even Tucker, in his exculpatory post-arrest statement admitted hearing a gunshot fired as Haynes argued with Ms. Hampton. Further establishing the cause of death, police and EMS workers who responded to the scene all testified to seeing Ms. Hampton slumped over in a car, bleeding profusely from the hole in her neck. In light of this evidence, no rational person could think the cause of death was anything other than a gunshot wound.

Petitioner nevertheless submits that the prosecution's failure to call the examining pathologist deprived him of the opportunity to probe the possibility that drugs or alcohol, traces of which were found in Ms. Hampton's body, were the real cause of death. In fact, since the drug and alcohol quantities were documented in the autopsy report, Tucker was free to pursue this hypothesis with the testifying medical examiner, who was certainly qualified to testify as to whether these substances, as opposed to the massive internal injuries noted, actually caused Ms. Hampton's death.

Because the trial court's admission into evidence of the Hampton autopsy reports without testimony from the examining pathologist did not violate the Confrontation Clause or, in the alternative, was harmless beyond a reasonable doubt, this court rejects Tucker's Sixth Amendment challenge to his conviction as without merit.

### B. *Prosecutorial Misconduct*

Tucker submits that he was denied a fair trial by the prosecutor's improper comments in opening and closing statements to the jury.

Specifically, petitioner complains of the prosecution's reference to state law in her opening statement: "I submit to you, ladies and gentlemen, the law will be very clear. When you're in the course of a felony and that felony is a robbery and someone gets killed because of it -." Trial Trans at 125. He cites to a similar reference to the law in summation: "Listen to the Court as to what intent is. Not that

you have to plan it three weeks ahead of time, three hours ahead of time or even three minutes ahead of time, but at the time it happens you've got the intent -." *Id.* at 622–23. Finally, petitioner faults the prosecution for referring to matters not in evidence in arguing the credibility of a prosecution witness:

> Cornelius McNeil, I make no excuses for him whatsoever..... Cornelius McNeil is Cornelius McNeil, a fourteen year old kid who does his living in the street. Now, what he's going to be like at sixteen or twenty-six or thirty-six, we will never know. We won't know what's going to happen but we know on that particular day at that particular time he was in front of 206 Cornelia Street with Bolivio and Ricardo watching the defendant and his homeboy rob and kill Renee Hampton. A fourteen year old versus a forty-five year old testify. Drug dealer versus doctor -

*Id.* at 638–39, 106 S.Ct. 1431.

■ Habeas review of prosecutorial misconduct claims is narrowly circumscribed. More than "mere trial error" is required to grant relief. *Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir.1998). Instead, a petitioner must show conduct "so egregious as to violate the defendant's due process rights." *Id.* (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 647–48, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Indeed, he must show "actual prejudice" in the form of "a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Bentley v. Scully,* 41 F.3d 818, 823 (2d Cir.1994)); *see also United States v. Shareef,* 190 F.3d 71, 78 (2d Cir.1999) (holding that even on direct review, "[p]rosecutorial misconduct is a ground for reversal only if it causes the defendant 'substantial prejudice' "). The Supreme Court has cautioned that any evaluation of prejudicial error resulting from inappropriate prosecutorial comments must be assessed in the context of the trial as a whole. *See United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). In making this evaluation, the Second Circuit has generally focused on three factors: "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *United States v. Elias,* 285 F.3d 183, 190 (2d Cir.2002). Applying these principles to Tucker's case, the court finds that the prosecutor's remarks did not deprive him of a fair trial.

■ First, none of the remarks evidenced egregious misconduct. While some judges do prohibit counsel from making any reference to the law in their opening or closing statements, where, as in this case, petitioner can point to no misstatement of law by the prosecutor, there is no prejudice to warrant habeas relief. Similarly, however speculative the comments about Cornelius McNeil's future, the statements were simply too vague to influence a jury in its assessment of the evidence.

Indeed, to the extent there was any error in the three statements, it was satisfactorily cured by the trial judge's prompt action in sustaining objections and cautioning the prosecutor in front of the jury that (1) the court would instruct on the applicable law, *see* Trial Trans. at 125, 623, and (2) the prosecutor should limit her argument to the facts in evidence, *see id.* at 639.

The court did subsequently instruct the jury in detail on both "acting in concert" and "intent," *see* Charge Trans. at 24–26, the legal principles alluded to by the prosecutor. Moreover, it explicitly charged the jurors that they were to apply the law as given to them by the court. *See* Trial Trans. at 114; Charge Trans. 2, 33. Since the law strongly presumes that jurors follow the instructions given them by the

court, Tucker· cannot show that he was denied a fair trial. *See United States v. Scheffer,* 523 U.S. 303, 336, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

The record further demonstrates that after the court cautioned the prosecutor to limit her remarks to facts in evidence, she carefully did so. For ten pages of transcript, she reviewed with the jury the evidence that supported Cornelius McNeil's testimony implicating Tucker in the robbery and murder of Rena Hampton. *See* Trial Trans. at 639–49. Here again, then, Tucker fails to show that he sustained any prejudice from the single speculative comment about McNeil's future.

In sum, because Tucker fails to demonstrate that prosecutorial misconduct in either opening or closing statements was so egregious as to violate his constitutional right to a fair trial, this part of his habeas petition is denied as without merit.

C. *Improper Jury Instructions*

■ Tucker asserts that he was denied a fair trial by three errors in the trial court's instructions to the jury. The Supreme Court has expressly ruled that errors of state law in jury instructions will not support a federal writ of habeas corpus unless they "so infect[ ] the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *accord Davis v. Strack,* 270 F.3d 111, 123 (2d Cir.2001). Moreover, in reviewing such a claim, habeas courts are cautioned not to judge challenged instructions "in artificial isolation" but rather to consider them "in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. at 147, 94 S.Ct. 396; *accord Vargas v. Keane,* 86 F.3d 1273, 1277 (2d Cir.1996). Applying these principles to Tucker's case, it is plain that the court's jury instructions did not violate his right to a fair trial.

■ Tucker first complains that the trial court, in responding to a jury note asking for clarification of the robbery and attempted robbery charges, unnecessarily prefaced its reiteration of the elements of these crimes by referring to the felony murder charge of the indictment:

Now, understand that the first count of the indictment charges that somebody died during the commission or attempted commission of a robbery by two people acting in concert. That's the first count; you understand that that is what the charge is.

Now· a robbery is defined as follows:
· . . . .

Charge Trans. at 39. Petitioner does not contend that the challenged remark misstated the charges against him. Rather, he complains that the remark was not responsive to the jury's inquiry. Trial judges, however, enjoy broad discretion in responding to the requests of deliberating juries. *See United States v. Young,* 140 F.3d 453, 456 & n. 1 (2d Cir.1998); *United States v. Abrams,* 137 F.3d 704, 708 (2d Cir.1998); *United States v. Parker,* 903 F.2d 91, 101 (2d Cir.1990); *United States v. Civelli,* 883 F.2d 191, 195 (2d Cir.1989). The robbery and attempted robbery charges, while constituting independent counts of the indictment, were also predicates to the felony murder charge. Under such circumstances, the trial judge's brief reference to the felony murder charge did not violate Tucker's constitutional right to a fair trial.

■ Tucker next submits that in responding to this same jury inquiry, the trial court misstated the law, substituting the word "may" for "must" in its discussion of the jury's duty if the prosecution failed to carry its burden of proof:

Now, if you find that the People have proven those elements beyond a reasonable doubt, you may find the defendant

guilty of the crime of robbery in the first degree.

If you're not satisfied that the People have proven each and every one of the elements, then you may find the defendant not guilty.

Charge Trans. at 41.

By itself, this instruction was erroneous. As the Second Circuit explained in *United States v. Birbal,* 62 F.3d 456 (2d Cir.1995), "instructing the jury that it 'may' rather than 'must' acquit if the government fail[s] to meet" its burden of proof, gives the jury "the clearly unlawful option of convicting on a lower standard of proof." But, the challenged language cannot be viewed in isolation. When viewed in the context of the court's overall instructions to the jury, it is apparent that the cited excerpt represented a single misstatement at odds with the court's repeated correct statement of the law. *See Cupp v. Naughten,* 414 U.S. at 147, 94 S.Ct. 396; *accord Vargas v. Keane,* 86 F.3d 1273, 1277 (2d Cir.1996). Indeed, the court instructed the jury on no less than seven separate occasions that if the prosecution failed to prove guilt beyond a reasonable doubt, the jury *must* acquit the defendant.

First, in its general discussion of the presumption of innocence, the court instructed the jury:

From the time the defendant uttered those words "Not guilty," up until this very moment, he is presumed to be not guilty, and that presumption will remain with him as you go into your jury room, and unless you are satisfied beyond a reasonable doubt that the presumption of innocence has been overcome or rebutted you must return a verdict of not guilty.

Charge Trans. at 6.

Then, in its instruction on felony murder, the court stated:

[I]f . . . the People have proved to your satisfaction beyond a reasonable

each of these four elements as I have just explained them, you may find the defendant guilty of murder in the second degree, that's felony murder.

On the other hand, if you find the People failed to prove to your satisfaction beyond a reasonable doubt any one or more of these four elements, then you must find the defendant not guilty of murder in the second degree.

*Id.* at 12–13.

In its principal instruction on first degree robbery, the court charged:

[I]f you find that the People have proved to your satisfaction beyond a reasonable doubt each of these five elements as I have just explained them, then you may find the defendant guilty of the crime of robbery in the first degree.

On the other hand, if you find that the People have failed to prove to your satisfaction beyond a reasonable doubt any one or more of these five elements, then you must find the defendant not guilty of robbery in the first degree.

*Id.* at 16.

Similarly, before concluding its discrete instructions on attempted robbery, second degree weapon possession, and third degree weapon possession, the court instructed that, as to each count, the jury "must" find the defendant not guilty if the prosecution failed to prove guilt beyond a reasonable doubt. *Id.* at 19, 21, 24.

Finally, in response to the very last jury inquiry before verdict, the court correctly charged that if the prosecution failed to meet its burden of proof, the jury "must" acquit the defendant:

Those are the elements that must be proven beyond a reasonable doubt; do you understand that, ladies and gentlemen? And the only way Mr. Tucker can be . . . found guilty beyond a reasonable doubt [is] if he was acting in concert

with Mr. Haynes during the commission or attempted commission of the robbery and Ms. Hampton died. If you do not find that you must find Mr. Tucker not guilty.

*Id.* 61.

Because the charge, viewed as a whole, repeatedly and correctly articulated the jury's plain duty to acquit if the prosecution did not carry its burden of proof, this court finds that the single unintended substitution of the word "may" for "must" did not so mislead or confuse the jury as to deny petitioner his constitutional right to a fair trial.

 In his final challenge to the jury charge, Tucker complains of an analogy drawn by the court between the legal concept of "acting in concert" and an orchestral performance.

[A]ssume we attend a concert . . . to hear a symphony orchestra. . . . The brass is on one side of the stage playing, the string section, the violins may be in the center of the stage playing and there's a pianist who is playing throughout, there's a drummer and off to the corner of the stage there's a musician with a triangle. Maybe once or twice during the entire concert he will hit the triangle. He's acting in concert with his fellow musicians even though he doesn't work as hard as his fellow musicians. . . . He is part of making that music, despite his minimal participation.

*Id.* at 24–25.

The use of this analogy did not deny Tucker a fair trial. To the contrary, the example helped to illustrate the legal principle that minor participants in a criminal scheme can be equally liable with principal actors. *See* N.Y. Penal Law § 125.25[3] (McKinney 1998); *People v. Lilly,* 139 A.D.2d 671, 672, 527 N.Y.S.2d 433, 435 (2d Dep't 1988) (approving orchestra analogy as a "nonprejudicial and elucidating example"). In any event, the trial court did not

rely solely on this analogy to instruct the jury on the concept of "acting in concert." Rather, it quoted directly from the relevant statute, N.Y. Penal Law § 20.00, explaining that "when one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct." Charge Trans. at 24. The court then detailed the required mental state, *see id.,* and, before concluding its instruction, emphasized that a person's "mere presence" at the scene of a crime would not be sufficient to prove acting in concert, *see id.* at 25–26.

In sum, because Tucker has failed to show that any errors in the jury charge deprived him of a fundamentally fair trial, this part of his petition is also rejected as without merit.

### D. *Limitations on Cross–Examination*

 Tucker further complains that the trial court improperly limited defense counsel's cross-examination of police witnesses with respect to (1) photographs of the crime scene, and (2) Tucker's oral exculpatory post-arrest statement. Both claims are without merit.

On direct examination of the patrol officer who first arrived at the murder scene, the prosecution offered various photographs of the site. On voir dire, defense counsel inquired as to the effect of the photographer's flashbulbs on the amount of light depicted in the photographs. *See* Trial Trans. at 139–40. Then, on cross-examination, defense counsel asked numerous questions about street lamps depicted in the photograph.

Q. [T]here is a lamp post down the block on the other side of the street,

some length away from this automobile, is that right?

A. It's on the same side of the street.

\* \* \* \* \* \*

Q. There's no lamp post in that photograph on the same side of the street; is that right?

A. That's right.

Q. Any lamp post depicted near the car on the same side of the street, according to the photograph is out, correct?

A. Yes.

Q. So, that photograph depicts one lamp light that's on, and that's on the other side of the street down the block; is that right?

A. Yes sir. Approximately one car-length behind.

Q. But across the street?

A. But across the street.

Q. Down the block from behind the car; is that right?

A. Yes, sir.

Trial Trans. at 156. Seeking to minimize tedious and repetitive questioning of items depicted in the photographs, the trial court observed, "[t]he picture speaks for itself," *id.*, whereupon defense counsel stated that he had no further questions for the witness.

This record reveals a pointed observation by the court, but no express limitation on defense counsel's cross-examination. Certainly, Tucker cites to no question that counsel would have asked but for the trial court's interjection. In any event, trial judges "retain wide latitude" to impose reasonable limits on cross-examination that is "repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *accord Fuller v. Gorczyk*, 273 F.3d 212, 219–20 (2d Cir.2001). Thus, to the extent the trial court's observation might be viewed as a limitation on cross-examination that duplicated what jurors could observe from the photographs already in evidence, the statement was well within its discretion.

The trial court did unequivocally prohibit defense counsel from questioning a different police witness about the substance of Tucker's oral post-arrest statement. Tucker asserts that since the prosecution put his videotaped post-arrest statement into evidence, he was entitled to offer his oral statement as well. Counsel's purpose was not subtle. He wished to bolster his client's videotaped denial of culpability with evidence that he had made the same statement in an unrecorded interview. The New York courts rejected this argument on the grounds that Tucker could not offer his own hearsay statements. *See People v. Weston*, 249 A.D.2d 496, 671 N.Y.S.2d 518, 528–29 (2d Dep't 1998) (holding defendant's hearsay statement inadmissible when offered in his favor); *People v. Cuevas*, 138 A.D.2d 620, 621–22, 526 N.Y.S.2d 206, 207 (2d Dep't 1988) (holding that defendant may not offer his own self-serving out-of-court statements into evidence). Such state court evidentiary rulings will generally not trigger federal habeas review. *See e.g., Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *accord, Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir.2001).

Certainly, neither the Constitution nor federal law supports Tucker's claim that he was entitled to offer his own hearsay statement into evidence. Rule 801(d)(2)(A) of the Federal Rules of Evidence only allows a party to offer into evidence the hearsay statement of his adversary, not that of himself. *See United States v. Rea*, 958 F.2d 1206, 1225 (2d Cir.1992); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir.1982) (holding that defendant could not offer his own hearsay statement for the truth of the matter asserted); *accord, Stapleton v. Greiner*, No.

98–CV–1971, 2000 WL 1207259, at *8 (July 10, 2000) (Raggi, J.).

 Although Tucker further challenges the exclusion of his oral statement as an impermissible attempt to get him to waive his Fifth Amendment right to remain silent, *see* Trial Trans. at 568–69 (trial court and defense counsel discuss Tucker testifying as to his oral post-arrest statement), since Tucker did not testify at trial, he sustained no prejudice in this respect.

### Conclusion

For the reasons stated, this court finds no merit to Tucker's claim that his state conviction was obtained in violation of his Sixth Amendment right to confront witnesses or his due process right to a fair trial. Neither does it find him to have sustained any violation of his Fifth Amendment right to remain silent. Accordingly, the petition for a writ of habeas corpus is denied as is a certificate of appealability.

*SO ORDERED.*